**FS SERVICES INC., Plaintiff,**

v.

**CUSTOM FARM SERVICES, INC., Defendant.**

**No. 68 C 2157.**

United States District Court, N. D. Illinois, E. D.

Oct. 14, 1970.

Richard Bushnell and Richard R. Trexler, Olson, Trexler, Wolters & Bushnell, Harry Meloy, Chicago, Ill., for plaintiff.

Hume, Clement, Hume & Lee, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NAPOLI, District Judge.

This cause coming on for trial on the merits of the complaint and the answer thereto, the Court having heard the evidence, having considered the memoranda

of counsel for the parties and being fully advised in the premises, now finds:

## FINDINGS OF FACT

1. Plaintiff, FS Services Inc., is a Delaware Corporation with its principal place of business in Bloomington, Illinois. Defendant, Custom Farm Services, Inc., a Delaware Corporation with its principal place of business in Atlanta, Georgia, has sold products or rendered services under the trademark in issue within the jurisdiction of this Court.

2. Plaintiff was organized as a farm cooperative in Illinois in 1927 under the name Illinois Farm Supply and continued under various names until the present. In 1962, plaintiff merged with Farm Bureau Service Company of Iowa and in 1965 Wisconsin Farm Company also merged with plaintiff; as of the dates of those mergers, plaintiff's operations were expanded beyond the State of Illinois to Iowa and Wisconsin. Plaintiff does not do a retail business directly with the public but, instead, sells products to affiliated farm cooperatives which, typically, are organized and service a county-wide area. Plaintiff's ultimate customers, the farmers, have very little knowledge of the name of plaintiff's corporation but instead farmers would be more familiar with the name of the county member company with which the farmer does business.

3. Plaintiff's member companies are retail facilities which are operated in the form of farmer-owned cooperatives. The owners of each of the member companies are farmers in the particular area who are members of the farm bureau. A typical member company of plaintiff's organization has substantial physical facilities such as the company office, one or more bulk blending plants for farm fertilizers, anhydrous ammonia tanks for the handling and distribution of liquid farm fertilizers, petroleum bulk distribution docks for fuels and lubricants and warehouses for bagged feed and chemical products. Some of plaintiff's member stores also have general retail facilities which have other items such as tires, batteries, paint brushes, clothing, motor fuels, etc. Plaintiff's sales are very substantial and in a typical year such as 1969, the sales of plaintiff were in excess of $158,000,000 and the sales of its member companies, after retail markup, exceeded $220,000,000 in the states of Illinois, Iowa and Wisconsin. A substantial number of the people doing business with the plaintiff's member stores are members of the local farm bureau and as farm bureau members, they are also owners of plaintiff's affiliated cooperatives. The members of the cooperative are entitled to a patronage refund of any profits earned by the cooperative at the end of the year. Plaintiff plays up its affiliation with farm bureau members and in its advertising refers to itself as a "farmer-owned service" or as a "farm bureau service".

4. In 1955, plaintiff adopted the trademarks FS after a detailed study of its existing public image by a management consultant firm. The words "farm service", and "farm supply" are common generic terms for similar farm product companies, and plaintiff's management consultant firm recommended a change from plaintiff's corporate name, Illinois Farm Supply, because of its lack of distinctiveness and further recommended a change to IFS or IF or IS or FS because such initials would have an existing tie-in with the company name. To the present day, employees of plaintiff's member stores may still identify their company as "Farm Service" or "FS", or are identified by the public as "Farm Supply" or "Farm Service". The initials, FS, were selected as an apt abbreviation of plaintiff's prior public identification as "Farm Supply" or "Farm Service" and also as a reference to the tradenames of plaintiff's member stores which commonly had the words "Farm Supply" or "Farm Service" in the company name.

5. Plaintiff uses the mark FS in plain block letters in some advertising but the more common use of the mark is

with a parallelogram and with the color combinations red and black. The mark FS, within its indicated design, is displayed on the buildings, equipment, products and advertising of plaintiff and its member farm cooperatives. Plaintiff is the owner of numerous registrations in the United States Patent Office for the mark FS, and design, registered for a wide variety of farm products and related services. Plaintiff's registrations claim use of FS and design for some products as early as August, 1955, and plaintiff's mark has been used continuously in Illinois since that date.

6. Plaintiff has extensively advertised its trademark and over a period of 15 years has spent slightly less than $15 million in advertising. Plaintiff advertises products and services in farm publications such as Prairie Farmer, Wisconsin Agriculturist, Wallace's Farmer, Dairy Herd Management, Feed Lot, Hog Farm Management, Successful Farming, and the Farm Journal. These are general farm magazines directed to farmers principally in the states of Illinois, Iowa and Wisconsin.

7. Plaintiff's customers are farmers that represent a general cross-section of farmers in the area in terms of educational background and size of their farms. Purchases of fertilizer by plaintiff's customers tend to be substantial in size and almost 80% of plaintiff's customers purchase $500 or more of fertilizer during each purchase. In a typical transaction, involving the bulk sale of fertilizer to a farmer, the farmer would bring his custom-designed specifications for the fertilizer to the plaintiff's blending plant. In many instances, the farmer's specification would be based on a soil test taken some months before which was then interpreted and translated by an agronomist into blend recommendations for the particular farm. The specified ingredients are weighed in the bulk blending plant and put into a mechanical blender and mixed. In most instances, the mixed product would not be bagged but would be removed from the bulk blending plant by the farmer in

a fertilizer spreader. A typical fertilizer spreader is worth about $1,800, but it is the custom for plaintiff to loan the spreader to the farmer without security because in a typical transaction the seller knows the farmer and trusts him. A farmer with a 400-acre farm would spend approximately $8,000 per year for fertilizer and, in addition to that, approximately $1,500 for agricultural chemicals such as pesticides and herbicides. There are two general periods in which these products are applied by the farmers. The first is in the fall at the time of plowing and the farmer shops during the summer in order to select the products that he will apply at that time. The other traditional time is the spring of the year and a farmer will generally shop all winter long to compare price and products before deciding where to buy. Farmers are generally quite conscious of price and will compare the competitive prices.

8. Cities Service Company organized the corporation known as Custom Farm Services, Inc. in order to provide retail outlets for the phosphate plants of its subsidiary, Tennessee Corporation. The decision was made to initially buy existing fertilizer blending plants because Cities Service lacked the experience in the market and the experienced personnel in order to construct and operate bulk fertilizer facilities. In December of 1964, Tennessee Corporation contracted to purchase the Liquilizer Companies, a group of eight affiliated Indiana corporations that had eight custom blending fertilizer plants in Indiana. Defendant corporation was incorporated on December 24, 1964 and the Liquilizer Companies were acquired by defendant. The Liquilizer Companies had been using the corporate name Custom Farm Services for four of its fertilizer blending plants continuously since at least as early as September, 1960. The marketing concept for defendant's developing retail activities was based on the custom blending of bulk fertilizer and the name Custom Farm Services was selected for the new corporation because it described

the principal marketing activities of defendant. At the time that the name, Custom Farm Services was selected for the new corporation because it described the principal marketing activities of defendant. At the time that the name, Custom Farm Services was approved for use by the new corporation, the management personnel responsible for this decision had no conscious prior knowledge of plaintiff's use of the trademark FS and, to the extent they had heard of plaintiff at all, it was under plaintiff's old corporate name, Illinois Farm Supply. Defendant commenced retail sales early in January, 1964 and, from the very start of its business, the use of the letters CFS developed as an abbreviation for defendant's corporate name, Custom Farm Services. The CFS logo, with a round shield design and arrows, was developed during the spring of 1965 and was first used on July 1, 1965. At the time the management personnel of defendant approved the CFS logo, they had no conscious prior knowledge of any use of the letters FS by plaintiff; at that time they still knew of plaintiff only by its former name, Illinois Farm Supply. At no time in the process of adoption of defendant's corporate name, or the CFS logo, was there any intent on the part of management of defendant to trade upon plaintiff's goodwill. At the time the colors red and white were selected for use with the new CFS logo, defendant's management personnel were not aware of any particular combinations used by plaintiff in association with plaintiff's FS trademark. There is no evidence that defendant willfully and wantonly copied or infringed plaintiff's trademark.

9. Plaintiff's first knowledge of defendant's activities was in September of 1966 when one of the defendant's ads featuring the CFS trademark appeared in Prairie Farmer Magazine and was brought to plaintiff's attention. The first notice to the defendant of plaintiff's charge of trademark infringement was a letter from plaintiff's attorneys dated March 21, 1967 to the corporate headquarters of defendant. In its first notice, plaintiff claimed no exclusive rights in the words "farm service" and, also, at the time of trial, plaintiff limited its complaint to the claimed similarity between the marks FS and CFS. When defendant received plaintiff's notice of infringement in March of 1967, it turned the matter over to its counsel and thereafter, for approximately one year, there was an exchange of correspondence between the counsel representing plaintiff and defendant and defendant's parent company. In the summer of 1968, a meeting was arranged between officers and attorneys of plaintiff and defendant in Bloomington, Illinois, at plaintiff's corporate headquarters. Shortly after that meeting, one of defendant's officers indicated that they would study the question of the adoption of another mark and consult with their marketing and public relations people as to the impact of such a decision, but defendant did not therein concede that it had any legal obligation to change its mark. The matter was thereafter discussed within defendant's corporate organization and was referred to defendant's parent company, because of the possible revision of the parent company's trademark identification, and the extension of that revision to defendant. By the end of 1968, defendant had not been able to resolve the question with defendant's parent company and had not responded to plaintiff's inquiries and at that time plaintiff filed the present litigation. There is substantial evidence in the record that defendant did not deliberately misrepresent its intentions or refuse to answer plaintiff's inquiries as part of any scheme to deceive plaintiff.

10. Defendant's first use of its CFS logo was on or about July 1, 1965, in the state of Illinois. From defendant's opening date to March 21, 1967, the date of the first notice from plaintiff, defendant opened 18 blending plants in Illinois and 14 blending plants in Iowa. It would now cost defendant approximately $300,000 to change its CFS trademark in all of its plants across the

United States. If it changed in the states of Illinois and Iowa, it would have to change in other areas in order to permit uniform advertising.

11. While there is some use of the letters CFS without the design in advertising, the predominant use is with the design. Defendant's CFS logo is customarily displayed on equipment, buildings, signs, advertisement, etc., in close association with defendant's full corporate name, Custom Farm Services, Inc. A comparison of designs typically used with their marks indicates that the designs are quite dissimilar and easily distinguishable, even at a substantial distance. A comparison of the company names used by the parties indicates that they are quite dissimilar and easily distinguishable.

12. About 70% of defendant's total sales are in bulk fertilizer. Another 20% are in crop protection chemicals, and the balance of sales, approximately 10%, are seed, feed and miscellaneous farm supply items. Defendant operates one store at Clinton, Illinois which has a wider line of farm products such as gloves, farm tools, etc. Defendant also handles animal feed at about ten of its blend plants. Out of defendant's total of 274 operational units only one has a complete line of farm products outside of the fertilizer, agriculture chemicals and feed product lines. While the miscellaneous farm products sold by the two companies do compete, the principal area of competition, dollarwise, is in bulk fertilizer and agricultural chemicals. Although an exact calculation is not available from the figures presented by plaintiff at trial, a conservative estimate of the dollar volume of plaintiff's fertilizer sales is that they are substantially in excess of $10,000,000 per year, in the states of Iowa and Illinois, for each year from 1965 to date. In terms of retail dollar volume there would be an approximate 12–15% markup from that base by the member stores. In 1969 defendant sold approximately $14,800,000 of fertilizer in the states of Illinois and Iowa which represented a total of 174,000 tons of fertilizer. Out of this amount, only 28 tons were in bag form and the remainder was delivered in bulk to the farmer. For the same year in the states of Illinois and Iowa, defendant spent approximately $261,000 advertising its products. While plaintiff sells to farmers ranging from the small farmer to the large farmer, the bulk of defendant's sales are to farmers in the upper half of the acreage category, because it is generally too expensive to program a prescription fertilizer program for an extremely small farm. About 80% of the defendant's sales within the state of Illinois is repeat business in which there has been one or more prior sales to the same customer. Defendant uses an agronomic marketing concept which endeavors to work with the farmer on an around the year basis in planning the farmer's fertilizer and chemical needs. Starting in June of each year, defendant's representatives contact farmers to take tissue samples of the field crops and to take soil tests. In the latter part of the summer defendant's representatives work with the farmer in planning fall plow downs of fertilizers or chemicals. Following delivery of such materials in the fall of the year, defendant's representatives then continue work with the farmer during the winter months planning the farmer's spring purchases of fertilizers and chemicals. In a typical customer file, defendant lists the results of the tissue and soil tests and the recommendations previously made to the farmer, together with the purchases by the farmer, over the period of months or years, and the results of the crop production. It is common in the industry for a farmer to purchase some of his fertilizer or chemical requirements from defendant and to go to a competitor for the remaining portion of his requirements. There have been very distressed prices in the fertilizer and Ag chemical business for three or four years and farmers are known for being price conscious and for shopping to determine competitive prices.

13. Plaintiff introduced into evidence some reports received from defendant's plant managers in response to a survey conducted by defendant. Out of 91 responses received by defendant from its plant managers, 14 of defendant's managers said there was some confusion. A subsequent investigation of these reports indicated to defendant, in the opinion of defendant's general manager, that the confusion referred to was the general business of two companies, i. e., both sold bulk fertilizer and also, possibly the common use of the words "farm service" and "farm supply" which tend to describe both companies' trade names. A review of the 14 reports indicated that the references in the reports were ambiguous. With the exception of one of defendant's plant managers, none of the individuals preparing the reports or the individuals who conducted the subsequent follow-up appeared in court as plaintiff's witnesses. While admitted into evidence as possible admissions, the information tendered in these reports and subsequent explanations was hearsay evidence, and was of little probative value. Some of the 14 reports referred to incidents in which truckers tried to deliver products at one of the defendant's plants when the delivery was apparently intended for plaintiff or someone else. In explanation of such incidents, defendant's witnesses testified that it has been defendant's experience that truckers will try to deliver products intended for a variety of other suppliers, including Atlantic Richfield, Monsanto or others. Defendant's witnesses testified that they also experienced problems with railroads who attempted to drop off cars at sidings at defendant's plants which were intended for third parties and defendant. A few of the reports referred to misdirected telephone calls and misdirected mail. Defendant's witnesses testified that they have had a problem with phone calls received at defendant's plants which were intended for parties other than plaintiff or defendant. This type of incident would occur primarily in areas where companies are listed as "farm supply" or "farm service" and because of defendant's use of its descriptive trade name, Custom Farm Services.

14. There had been substantial side-by-side sales of products by both plaintiff and defendant, in direct competition with each other, in the states of Illinois and Iowa for over four years at the time of trial. At the trial, plaintiff offered no clear and substantial evidence of confusion attributable to the trademarks in issue. At the time of trial, plaintiff was unable to document even one dollar in lost sales which, in the opinion of plaintiff's executive, was attributable to confusion between the trademarks.

15. In addition to the present litigation, plaintiff has encountered other situations in which the use of the letters FS, alone or in combination with other letters, appeared in the agricultural product area. The manner in which these situations have been handled by plaintiff and the extent to which these other uses have or have not produced evidence of confusion are pertinent to the credibility of plaintiff's claim here that there is a likelihood of confusion between plaintiff's and defendant's trademarks. Plaintiff's professed policy in the protection of its trademark is to challenge any third party who uses the letters FS, alone or in combination with other letters of the alphabet, when the company markets products in the agricultural consumer market; plaintiff would consider it an aggravated infringement of its rights and especially prone to confuse purchasers, if, in addition, the other party used the color scheme red and white along with the FS letters. As part of its evaluation of trademark conflicts, plaintiff has an established procedure within its organization, and its member companies, where the personnel in these organizations are made sensitive to potential infringements and are reminded to be on the lookout for uses of marks which are causing confusion with plaintiff. The matter is called to the attention of member company personnel at regular inter-

vals in staff meetings, and they are reminded to report instances of confusion to plaintiff's corporate headquarters.

16. Prior to the time that plaintiff commenced use of its FS trademark, it obtained a search report to determine if there were other possibly conflicting marks. At that time a registration, No. 176,874 for the trademark FS owned by Quaker Oats Company, for rolled oats, cornmeal, wheatflour, hominy and stock foods, was brought to plaintiff's attention. Plaintiff then approached Quaker Oats in 1954 and asked if Quaker Oats had any objection to plaintiff's use of FS. Based on plaintiff's agreement with Quaker Oats, plaintiff then commenced the sale of animal feeds, as well as other products, under the FS trademark. Thirteen years later, in 1967, plaintiff again approached Quaker Oats and negotiated the purchase of Quaker's FS trademark registration for the sum of $1,000.00. Prior to the time that plaintiff purchased the Quaker FS registration, plaintiff's policy was to challenge anyone using the letters FS, alone or in combination with other letters of the alphabet, in the agricultural products field. The fact that Quaker had a registration for FS for animal feed did not in any way modify that policy. At the time of the assignment of this registration to plaintiff by Quaker Oats, there was no evidence that Quaker at that time was using the mark on any of the registered products, including animal feeds. One of the companies that plaintiff challenged was Feed Service Corporation which was using the trademark FSC for various types of liquid animal feeds or feed supplements. At the time plaintiff brought the opposition proceeding against Feed Service Corporation, plaintiff had not yet acquired the Quaker Oats registration for FS for animal feeds. The Feed Service Corporation use of FSC was brought to plaintiff's attention by its attorney through the publication of the FSC trademark in the Patent Office Gazette. After the matter was brought to plaintiff's attention, an investigation was commenced to determine what kind of products Feed Service Corporation sold and in what areas. One of the areas where Feed Service Corporation was selling products was Iowa. At no time before or during the pendency of the opposition proceeding against Feed Service Corporation was any evidence of actual confusion between plaintiff's mark and FSC brought to plaintiff's attention. In the opinion of plaintiff's officer in charge of such matters, the acquisition of the Quaker FS registration was not necessarily tied in with the opposition proceeding against FSC, but rather, was plaintiff's way of accumulating a trademark that was in conflict with its mark and to strengthen its legal position.

17. When plaintiff adopted its FS trademark in 1954, plaintiff's search report indicated there was another company by the name of Felton-Sibley that had a registered trademark, FS, for paint. At this time, some of plaintiff's member stores were offering paint products for sale. Because Felton-Sibley had prior use of FS, plaintiff decided to contact that firm and work out an understanding between the companies. An agreement was worked out between the lawyers which permitted plaintiff to use FS, provided it did not expand the sale of paint products into the trade territory of Felton-Sibley.

18. Prior to plaintiff's adoption of the FS trademark, the F. S. Royster Guano Company was issued a trademark registration for FSR for fertilizers dated August 8, 1905, and again in 1961, F. S. Royster was issued a second Patent Office registration for FSR for fertilizers. The use of FSR on fertilizers was within the defined policy of plaintiff relating to challenging third parties who use the initials FS on farm-oriented products. F. S. Royster has a plant at Essex, Illinois that has a diamond shaped sign on the exterior of the plant with the initials FSR on it. F. S. Royster also has the FSR symbol on its trucks. The F. S. Royster plant at Essex has been open since 1967 and is a bulk blending fertilizer and Ag chemical

plant which sells in direct competition with plaintiff's and defendant's bulk fertilizer plants in the area. Although the question of F. S. Royster was brought to the attention of plaintiff's officials in discovery procedures in this cause, plaintiff had never initiated any investigation of F. S. Royster or commenced any legal proceedings and, as of the time of the litigation, was unaware of any evidence of confusion between plaintiff's FS mark and FSR.

19. Other third party uses of marks incorporating the letters FS have occurred in plaintiff's trade territory in the farm products field without resulting in confusion. Plaintiff distributes a number of types of publications. The Farmer's Cooperative Service, a division of the Department of Agriculture, has used the initials FCS to identify agricultural publications and has been well known to plaintiff's officers for about 20 years. The use of the identifying symbol FCS by Farmer's Cooperative Service is not considered objectionable by plaintiff because the Department of Agriculture is associated with the government and is a completely different type of operation in the opinion of plaintiff's officers. When plaintiff adopted the mark FS, it had no intent to tie in with Farmer's Cooperative Service of the Department of Agiculture, and in the judgment of plaintiff's officers, plaintiff's mark FS is quite distinguishable from FCS. There is no evidence of confusion between plaintiff and Farmer's Cooperative Service.

20. Plaintiff's trademark enforcement policy against another third party use, Farmer's Store Company of Eau Claire, Wisconsin, has been quite inconsistent. The Farmers' Store Company has been operating since 1891 and, at the time of trial, had 15 retail stores located in west central Wisconsin. The principal product lines of Farmers' Store Company include supermarket operations, clothing, furniture, appliances and, within the farm products area, items such as farm implements, including tractors, spreaders, combines, plows, etc., and fence chargers, milk filters and other hardware items. Farmers' Store Company also sells bagged and bulk fertilizer for use on the farm and various agricultural chemicals including herbicides and insecticides. The annual dollar volume of the Farmers' Store Company has risen gradually from $10,000,000 in 1946 to $14,000,000 in 1969, including annual sales of bulk fertilizer, animal feed and farm seed, between $200,000 and $250,000 per year and additional sales of about $200,000 of farm tractors and implements. Farmers' Store Company has been identified by the public as "FS" going back at least to 1935 and continuously ever since. In 1962 Farmers' Store Company adopted a round design mark with the letters FS in it for use in advertising. Commencing in 1964, a similar logo with the letters FS in it was used on store signs. Farmers' Store Company has made extensive use of the FS mark in advertising, store signs, cash register receipts, hang tags, billing statements, carry out bags, and in newspaper, radio and television advertising. Several of the plaintiff's member stores are within the trade territory of the Farmers' Store Company and there are numerous items offered by Farmers' Store Company which are directly competitive with the type of product listed in plaintiff's patron guide. Plaintiff first became aware of the Farmers' Store Company in 1965 and sometime thereafter initiated an investigation. Plaintiff then directed a notice of infringement through its attorney to the Farmers' Store and carried on periodic correspondence between counsels until September, 1969. On September 3, 1969, plaintiff's attorney stated in a letter that Farmers' Store would be strictly accountable for any injury or damages suffered by plaintiff although as of that date plaintiff's officers felt there was no real conflict with Farmers' Store. In a responsive letter dated September 9, 1969, the attorney for Farmers' Store submitted that Farmers' Store had prior use of the letters FS. Since receiving that infor-

mation, plaintiff has sent no further letters to Farmers' Store or taken other action. As of the time of trial, plaintiff was unaware of any evidence of actual confusion between plaintiff and Farmers' Store. The general manager of Farmers' Store was likewise unaware of any confusion.

21. Another third party use is Trowbridge Farm Supply. That company was formed as a partnership in 1952 by Robert A. Trowbridge and was operated as Trowbridge Limestone and Phosphate in Latham, Illinois, until December, 1953, when the name was changed to Trowbridge Farm Supply Company. In December of 1953, the symbol TFS was adopted by that company as an abbreviation of its new partnership name. In December of 1953 or January of 1954, the TFS symbol was applied to the sides of the trucks used by the company, utilizing the color combinations red and white. The TFS symbol was also applied to business cards and stationery during that same period of time. In the spring of 1954, business cards and stationery were printed and signs were put up in front of the plants of Trowbridge Farm Supply with the TFS symbol on them. The Trowbridge partnership continued until August of 1965 when it was formed into a corporation and at that time the style of the TFS was changed to a block style of type. In one style or another, Trowbridge Farm Supply has used the letters TFS, in red and white colors, on its business equipment, business papers and store signs since December of 1953 or January of 1954 continuously until the present time. At the time the partnership changed its name in December of 1953, it was engaged in retail sales of animal feed, farm seed, bulk and bagged fertilizer, agricultural chemicals, white rock and grain sold to farmers or farm operators or managers. Trowbridge Farm Supply sold in the five-county area of Macon, Sangamon, Logan, DeWitt and Wyatt Counties, Illinois, where its closest competition was the Farm Bureau member companies in each of the counties. Sales of the partnership and successor corporation, which was formed in 1965, gradually increased from $300,000 in 1954 to $600,000 in 1965. At the time the retail business was sold in 1967, the TFS emblem was on fifty or sixty pieces of rolling stock, such as liquid fertilizer tanks, pickup trucks and semi-trailers and tractors. At no time, since December of 1953, has any evidence of confusion between TFS and FS been brought to the attention of Trowbridge Farm Supply. On numerous occasions since 1954, the owner of Trowbridge Farm Supply has conversed with managers or personnel working for FS services or its member companies, including officials at plaintiff's Bloomington headquarters, and has exchanged surplus products or sold products to FS member stores, but at no time has any representative of FS ever complained or referred to any problem of confusion.

22. The uses of such third party marks, and the absence of any evidence of confusion, confirm that such farm products are sold under conditions where they are purchased carefully and the parties to the transaction are not likely to assume a single source for the products because of the presence of common letters of the alphabet.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter of this suit.

2. Plaintiff's United States Patent Office registrations for the trademark and service mark, FS, registration numbers, 636,120, 638,282, 650,820, 659,711, 663,313, 843,081, 851,-668 and 854,856 are valid and are owned by plaintiff but plaintiff's rights in said registrations are limited to the combination of letters and designs displayed on said registrations. Farm Service, Inc. v. United States Steel Corporation, 149 U.S.P.Q. 861 (Idaho Sup.Ct.1966); American Automobile Association v. World Automobile Association, Inc., 110 U.S.P.Q. 365 (Com. Pat.1956); Breth v. Cutting Room

Appliances Corp., 57 U.S.P.Q. 56 (Com. Pat.1943); In re BTU Engineering Corporation, 137 U.S.P.Q. 325 (P.O.T.T.A. B.1963); Dollfus-Mieg Et Cie Societe Anonyme v. Richardson Silk Co., 55 U. S.App.D.C. 226, 4 F.2d 302 (1925); John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961).

■ 3. Plaintiff's rights in its trademark and service mark, FS and design, are limited and defined by other registrations issued by the United States Patent Office, namely:

   a) FSR Registration 45,414 issued August 8, 1905 to F. S. Royster for guano fertilizer.

   b) FSR Registration 713,747 issued April 11, 1961 to F. S. Royster for fertilizers.

   c) F & S Registration issued to Felton-Sibley, for paint.

National Motor Bearing Co., Inc. v. James-Pond-Clark, 266 F.2d 799, 46 C. C.P.A. 877 (1959).

■ 4. Plaintiff's rights in its trademark and service mark, FS and design, are limited and defined by the prior use of the trademark and service mark, TFS by Trowbridge Farm Supply in the central Illinois area within a portion of plaintiff's trade territory.

■ 5. Plaintiff's rights in its trademark and service mark, FS and design, are limited and defined by the prior common use of the identifying name FS Store by Farmers' Store Company in portions of Wisconsin and within the same trade area as some of plaintiff's member stores. 3 Callman, The Law Of Unfair Competition Trademarks and Monopolies Sec. 77.3; Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, 20 F.Supp. 703, 705–706 (E.D. Pa.1937); Howard Johnson Company v. Ho-Jo Campsites, 273 F.Supp. 447 (M.D.Fla.1967).

6. The purchasers of the goods of plaintiff and defendant are discriminating buyers capable of discerning the differences between the trademarks and service marks of the parties. Clayton Mark & Company v. Westinghouse Electric Corporation, 356 F.2d 943, 944, 53 C.C.P.A. 951 (1966); Comfort Equipment Company v. Yetter Manufacturing Co., Inc., 140 U.S.P.Q. 398, 400 (P.O.T. T.A.B.1963); General Adjustment Bureau, Inc. v. General Insurance Adjustment Company, 381 F.2d 991 (10th Cir. 1967).

■ 7. The substantial side-by-side use of the trademarks and service marks of plaintiff and defendant, without evidence of actual confusion, creates a strong presumption against likelihood of any such confusion in the future. Societe Anonyme De La Grande Distillerie E. Cusenier Fils Aine & Cie v. Julius Wile Sons & Co., 161 F.Supp. 545, 548 (S.D.N.Y.1958); Application of Myers, 201 F.2d 379, 384, 40 C.C.P.A. 747 (1953).

■ 8. Defendant has not infringed plaintiff's rights through defendant's use of the trademark and service mark, CFS. Life Savers Corp. v. Curtiss Candy Co., 182 F.2d 4, 8 (7th Cir. 1950); Sure-Fit Products Company v. Saltzson Drapery Company, 254 F.2d 158, 160, 45 C.C.P.A. 856 (1959); Fleetwood Company v. Mende, 298 F.2d 797, 49 C.C.P.A. 907 (1962).

9. Defendant has not competed unfairly with plaintiff. Life Savers Corp. v. Curtiss Candy Co., 182 F.2d 4, 8 (7th Cir. 1950); Fleetwood Company v. Mende, 298 F.2d 797, 49 C.C.P.A. 907 (1962).

10. Plaintiff has failed to prove a preponderance of competent and credible evidence that there is a likelihood of confusion between the marks in issue that would justify injunctive relief under general equitable principles.

11. Defendant has not maliciously copied plaintiff's trademark or competed unfairly with plaintiff.

12. Defendant is entitled to a judgment that plaintiff takes nothing dismissing the complaint, and defendant may recover its costs to be taxed by the clerk.