**KNAACK MANUFACTURING COMPANY, Plaintiff,**

v.

**RALLY ACCESSORIES, INC., Defendant.**

No. 96 C 3387.

United States District Court, N.D. Illinois, Eastern Division.

March 3, 1997.

Bruce M. Gagala, Mark J. Liss, Leydig, Voit & Meyer, Ltd., Chicago, IL, for Plaintiff.

Steven I. Peretz, Kluger, Peretz, Kaplan & Berlin, P.A., Miami, FL, Hope G. Nightingale, Burditt & Radzius, Chicago, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DENLOW, United States Magistrate Judge.

This case raises the significant question of the scope of trademark protection afforded to the holder of an incontestible mark.

The Court conducted a four-day bench trial. The Court has carefully considered the in-court testimony of six witnesses, the deposition testimony of five witnesses, the hundreds of exhibits introduced into evidence, the legal authorities cited by the parties and the excellent closing arguments of counsel. The Court enters the following findings of fact and conclusions of law pursuant to rule 52(a) of the Federal Rules of Civil Procedure.

## I. THE PARTIES.

1. Plaintiff Knaack Manufacturing Company ("Knaack") is an Illinois corporation with its principal place of business in Crystal Lake, Illinois. Since 1971, Knaack has used the WEATHER GUARD trademark to identify its line of tool boxes, storage equipment and related truck and van equipment.

2. Defendant Rally Accessories, Inc. ("Rally") is a Florida corporation with its principal place of business in Miami, Florida. Rally was founded in 1980 and is in the business of selling automotive after-market accessories primarily through general merchandise discount retailers (such as K–Mart, Target, Wal–Mart and Venture) and automotive accessory stores (such as Pep Boys, NAPA and Whitlock). Since 1995, Rally has been selling semi-fitted car covers under the WeatherGUARD trademark.

## II. JURISDICTION AND VENUE.

3. This is an action for infringement of Knaack's federally registered trademark, WEATHER GUARD, under § 32 of the Lanham Act, 15 U.S.C. § 1114, unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), dilution and injury to business reputation under the Illinois Anti–Dilution Act, 765 ILCS 1035/15, deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* and state and common law unfair competition, by reason of Rally's use in commerce of the name "WeatherGUARD."

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 15 U.S.C. § 1121, 28 U.S.C. §§ 1338(a) and (b), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Rally is doing business in this district.

## III. THE ISSUE TO BE DECIDED.

6. This case raises the question of whether Rally has violated either federal or state trademark, unfair competition or anti-dilution

law by using the WeatherGUARD trademark to identify its car, van, sports utility or pick-up truck car covers.

## IV. THE KNAACK WEATHER GUARD TRADEMARKS.

7. Knaack holds three incontestible federal trademark registrations relating to its WEATHER GUARD mark:

(a) Registration No. 842,268 for the mark WEATHER GUARD (Stylized) issued January 16, 1968 for the identification of "tool chests" in U.S. Class 2;

(b) Registration No. 1,661,625 for the mark WEATHER GUARD (Unstylized) issued October 22, 1991 for the identification of "storage boxes, tool boxes, strong boxes, small parts boxes, ladder racks, storage racks, storage trays storage cabinets, storage units, conduit storage units, shelving units, transfer tanks for combustible and non-combustible liquids, and bulk heads, all for land vehicles in International Class 12;" and

(c) Registration No. 1,663,369 for the WEATHER GUARD mark (Stylized) issued November 5, 1991 for the identification of the same goods described in Registration No. 1,661,625. The 1,663,-369 Registration further provides for the rendering of the WEATHER GUARD mark in the color red.

(Px 1–3).

8. Knaack targets its WEATHER GUARD product line primarily to persons in the contractor trades who transport their tools, equipment, and supplies to a job site or to a customer by truck or van. The WEATHER GUARD catalog describes the market as follows: "Our thirty-three years of experience doing business with the contractor trades has helped us to develop an understanding for the expectations of the person making his living working out of a van" (Px 61), or "a pickup truck." (Px 55). Knaack's mission is "to manufacture and market worldwide, the finest truck, van and storage equipment consistent with our customers' needs and expectations." (Dx 1). Products which Knaack manufactures and sells under its WEATHER GUARD trademark include shelving, cabinets, drawer units, ladder racks, storage boxes, storage racks and van mats. (Px 55 and 61). The WEATHER GUARD line has expanded over time. (Px 47–60).

9. Knaack markets over 300 WEATHER GUARD products through over 1400 dealers and distributors nationwide. (Px 14). The WEATHER GUARD line constitutes over 70% of Knaack's annual sales. Traditionally, Knaack's WEATHER GUARD brand products were sold through contractors and industrial supply type houses and through pure trade equipment distributors who install various types of equipment on trucks.

10. More recently, marketing of the WEATHER GUARD product line has also been gradually expanded into markets which also service the non-commercial consumer. As the public's non-commercial use of vans, pickups and sports utility vehicles has grown, Knaack's distributors have also attempted to market certain of the WEATHER GUARD products for non-commercial uses. Knaack does not attempt to market its WEATHER GUARD product line through mass marketers or through specialty auto stores. Knaack presented no evidence and has no data concerning the extent of non-commercial use of its products. Knaack presented no evidence regarding how many of its customers purchase vehicle covers.

11. In 1995, Knaack spent approximately $1 million to promote its WEATHER GUARD products. These promotional expenditures were directed primarily to the professional contractor "who earns his living from a truck" or "van" and to trade show promotions limited to the construction trades. (Px 87). Knaack employs manufacturer's reps who are responsible for sales and service in assigned geographic areas.

12. Knaack's steel and aluminum WEATHER GUARD tool and storage boxes sell at retail for an average sales price of $300 to $400 each. WEATHER GUARD "storage systems" (specifically configured to meet the needs of electricians, plumbers, contractors, cable installers, etc.) sell for $500 to well over $1,000 depending upon the features selected. These products require assembly

and permanent vehicle installation bolted to the customer's van or truck. (Px 47–54).

13. Knaack manufactures a quality product.

## V. THE RALLY WeatherGUARD TRADEMARK.

### A. The Decision To Introduce a Rally WeatherGUARD Car Cover.

14. Rally is one of the nation's leading automotive after-market accessory companies to the general consumer market. Rally relies heavily on four color eye-catching packaging to attract consumer attention in a retail floor environment. All Rally product lines display the "RALLY" brand name and checkered flags on their packaging. (Px 131). Rally has twelve principal lines of business: 1) antennas; 2) auto accessories; 3) car covers; 4) compressors, hand and foot pumps; 5) floor mats; 6) jacks; 7) lighting; 8) lug nuts, locks and wheel accessories; 9) mirrors; 10) wheel covers; 11) wipers; and 12) work accessories and tie downs. (Px 131). This litigation involves the Weather-GUARD portion of the Rally car cover line of products. Rally does not use the Weather-GUARD name for any other products.

15. In 1992, Rally introduced its SIL-VERGUARD car cover to its product line. In 1994, Rally introduced its GOLDGUARD car cover. In addition, Rally carried a poly-cotton and a nylon car cover. In late 1994, Rally considered introducing another car cover product employing a new type of weather-resistant fabric. Rally has used the GUARD portion of its name to connote protection from the elements for its GOLDGUARD and SILVERGUARD covers.

16. In early January 1995, Mark Iacovelli, the president of Rally and Donna Kreidt, the company's creative director, selected the name "Weatherguard" to identify this new product. The product color was blue, but Rally did not think it made sense to expand the use of colors in its name. Instead, they chose a name which they believed communicated the product function. At the time, neither individual was aware of either Knaack or Knaack's WEATHER GUARD product line. Rally selected the Weather-GUARD mark to build upon the goodwill Rally had already created through its SIL-VERGUARD and GOLDGUARD product lines. The selection of the WeatherGUARD mark sought to expand Rally's "GUARD" family of car cover products. Rally relies on its colorful and descriptive packaging as a silent salesman and has developed a "family" of products at five different qualities and price points. GOLDGUARD is at the top of the line and retails at $89–$120. SILVER-GUARD is next at $69–$99 followed by WEATHER GUARD at $49–$79. The poly-cotton and nylon car covers are at the bottom of the line.

### B. Rally's Trademark Search And Registration.

17. On January 17, 1995, Rally contacted its trademark counsel, the Washington law firm of Longacre & White, a firm specializing in intellectual property law, to determine the availability of the WeatherGUARD mark for its car cover product. (Px 139).

18. In response to Rally's request, an attorney for the firm, Mikolean Morgan, undertook a search of federally registered trademarks. The trademark search revealed 12 pre-existing federal registrations and approved applications using "weather guard" (or its equivalent) in each mark, including the federal registrations held by Knaack. (Px 140). The search identified other third-party usage or claims of this mark on a wide variety of products and services (including five vehicle-related products):

| Mark | Registration No. | Usage |
|------|------------------|-------|
| WEATHERGARD | 1,408,580 | Fabric used as linings for draperies. |
| WEATHER GUARD | 74/306,723 | Tent flies and fabric finish. |
| CSL WEATHERGUARD | 74/343,325 | Water repellent for leather. Abandoned 4/28/94 |

| Mark | Registration No. | Usage |
|------|------------------|-------|
| WEATHERGARD | 1,463,238 | **Vehicle** windshield cleaner. |
| WEATHER GARD | 1,233,187 | Antifreeze for **vehicle** radiator systems. |
| WEATHER GUARD (Stylized) | 727,159 | Metal fasteners used in construction industry. |
| WEATHER GUARD (Stylized) | 1,482,272 | Weather insulated roofs. |
| WEATHER GUARD USA | 1,599,084 | **Automotive** appearance protection chemicals. |
| WEATHER GUARD | 1,516,919 | Sound insulating coating for **vehicles**. |
| WEATHER GUARD (Stylized) | 1,760,987 | Prefabricated and portable steel structures, including **carports**, awnings, patio covers and self-support storage sheds. |

19. Based on the search, Rally's counsel advised Rally that "In my opinion, the mark WEATHER GUARD for car covers is probably registerable." (Px 140). Counsel did indicate that there might be a problem with the "Weather Guard USA" mark because the owner of that mark "may construe your marketplace, namely automotive accessories, as the same market in which they sell." (Id.) In reliance on this advice of counsel, and Mr. Iacovelli's own examination of the classes of goods, Rally proceeded with the product development of its new car cover under the WeatherGUARD mark.

20. On January 25, 1995, Rally instructed its trademark counsel to immediately prepare a trademark application for federal registration of the WeatherGUARD mark. (Px 142). On February 7, Rally's trademark counsel filed an intent-to-use application on behalf of the WeatherGUARD mark to identify car covers with the U.S. Patent and Trademark Office. (Px 143).

21. Upon submitting its Trademark Application to the U.S. Patent and Trademark Office, Rally's file was referred to a trademark Examiner for a determination of registrability. Lanham Act § 12(a), 15 U.S.C. § 1062(a).

22. On June 25, 1995, the U.S. Patent and Trademark Office advised Rally's trademark counsel that the examining attorney had "searched the office records and has found no similar registered or pending mark which would bar registration under Trademark Act § 2(d), 15 U.S.C. § 1052(d)." (Px 145). On July 17, 1995, Rally's trademark counsel advised Rally that the examining attorney would approve Rally's mark for publication. (Px 145). The mark was published for opposition in the *Official Gazette* on October 24, 1995. (Px 146). Jeffrey M. Samuels, former Assistant Commissioner of Trademarks at the U.S. Patent and Trademark Office, testified as an expert witness for Rally. He explained the customary procedures for conducting a trademark search and opined that Rally had taken the proper steps in connection with its trademark application.

## C. Introduction Of The Rally Weather-GUARD Car Cover Into The Market.

23. In early November 1995, Rally introduced its WeatherGUARD car cover at the Automotive Parts and Accessories Association Trade Show ("APAA"). The APAA show is the industry's largest annual trade show and represents Rally's most important promotional activity for its entire product

line. This trade show is the only trade show where Rally exhibits its products in the United States. Rally has one of the largest booths and spent over $250,000 on the show. The show is attended by professional buyers for the large regional and national retailers. The trade show is not open to the general public. In marketing its products, Rally devotes substantial resources to developing planograms for suggested methods of displaying its car covers and other products. Car covers represent a small fraction of Rally's product line and sales volume. (Px 131).

24. Knaack is not an exhibitor at the APAA show. There is no overlap between the trade shows attended by Rally and Knaack.

25. In early November 1995, Rally also introduced its 1996 company catalog. Of the catalog's 166 pages, two pages included information on the WeatherGUARD car cover. (Px 131). The company catalog is not distributed to the general public. Instead, Rally distributes the catalog primarily to professional buyers interested in purchasing products for retail sales.

26. Rally's WeatherGUARD car covers sell at retail for between $49 and $79 each. The WeatherGUARD car covers come in six sizes ranging from extra small to extra large. These different sizes offer a "semi-custom fit" on most cars. The cover is blue and only the box bears the WeatherGUARD mark. (Dx 40). As the mark suggests, and the product's packaging confirms, the Weather-GUARD car cover provides general weather protection: "PROTECTS AGAINST THE ELEMENTS." (Dx 40). The product is targeted at the general consumer market.

**D. Knaack's Objections To Rally And Institution Of Litigation.**

27. On December 8, 1995, Knaack's counsel informed Rally's counsel of Knaack's objection to Rally's pending WeatherGUARD trademark application. (Px 147). This constituted Rally's first notice of a complaint. On December 13, Rally's trademark counsel advised Rally that Rally would "probably win an opposition" proceeding if Knaack pursued its challenge with the U.S. Patent and Trademark Office. (Px 147). In response, on December 14, Rally's President, Marc Iacovelli, informed counsel of the numerous marketing factors which undercut Knaack's infringement claim. (Px 148). At trial, Mr. Iacovelli persuasively explained the variety of ways in which Rally's vehicle covers and Knaack's products differ in terms of function, price point, packaging and method of installation and use. Based on the advice of counsel, coupled with its own understanding of the marketplace, Rally retained the Weather-GUARD mark and has continued its sale of the product under such mark. Rally currently intends to expand the use of the WeatherGUARD mark to include van, pickup and sports utility vehicle covers.

28. On June 5, 1996, Knaack filed this action. Knaack filed this action to protect its mark and because of a concern that their customers might be unhappy if they bought a Rally WeatherGUARD car cover. Knaack never tested the car cover to determine its quality. In addition, Knaack's President, Robert F. Ripley, explained that he was trying to protect the livelihood of the 450 Knaack employees who manufacture and sell the WEATHERGUARD product line. At the time, Knaack had no knowledge of Rally's product line apart from Rally's Weather-GUARD car cover. In fact, Kenneth F. Weger, Jr., Knaack's Vice President of Manufacturing and the person primarily responsible for trademark enforcement admitted that at the time suit was filed, he believed Rally was a producer of automotive waxes and finishes. He had confused defendant Rally with another company. At the time suit was filed, Weger had no knowledge of Rally's product line, other than the car cover, and had never seen a Rally catalog. He detailed a prior history of Knaack's efforts to police its trademark with mixed results. (Px 91–92, 102, 104, 107–110).

29. Through December 1996, Rally sold approximately 9000 units of its Weather-GUARD car cover product to its wholesale customers. These sales generated approximately $245,000 in revenue and gross profits of 46%.

30. Rally's WeatherGUARD car covers do not bear the mark WeatherGUARD on any portion of the product. When the car cover is in use, persons viewing the car cover

cannot identify it as a Rally WeatherGUARD product.

31. Instead, Rally promotes its Weather-GUARD car covers to the retail consumer primarily through the packaging of the product. The WeatherGUARD car packaging employs glossy four-color printing, high impact graphics, and pictorial representations of the product in use. (Dx 39–44, 48). Such merchandising seeks to capture the attention of the retail consumer at the point-of-sale and then educate the consumer about the product's features through the informational content of the packaging.

32. Graphically, the WeatherGUARD packaging is designed to provide a "family" appearance for the product when displayed with Rally's SILVERGUARD and GOLD-GUARD car covers on retail shelves. Because Rally's WeatherGUARD product does not itself bear the WeatherGUARD mark and because Rally's product catalog is not generally distributed to the retail consumer, the product's packaging represents the only medium where the purchaser actually sees the Rally WeatherGUARD mark in the retail marketplace.

33. All WeatherGUARD packaging bears the Rally brand name and checkered flag emblem above the WeatherGUARD mark.

34. Since Rally's introduction of its WeatherGUARD car covers fourteen months ago, there have been no instances of actual confusion in the marketplace. At the time of trial, WeatherGUARD vehicle covers were being sold through fourteen Rally customers. (Px 133).

35. Knaack offered no evidence that Rally's introduction of its WeatherGUARD car covers has caused Knaack to lose any product sales or otherwise cause Knaack to sustain any economic damage.

## VI. THIRD-PARTY USAGE OF THE WEATHER GUARD MARK.

36. The WEATHER GUARD mark and its derivatives have been adopted by third-parties to identify a wide variety of goods, services and businesses. In addition, Knaack reached settlements with two companies, permitting them to use the Weatherguard name in connection with carports, awnings, patio covers (Dx 9) and on automotive protective coatings. (Dx 10 and 61).

37. A plethora of evidence regarding third party usage of the Weatherguard name was introduced by Rally. This evidence included promotional literature from American Sigma, Inc. for its Weatherguard Fiberglass Enclosures (Dx 49); a sample of Weatherguard strapping material from Caristrap International, Inc. (Dx 67 and 68A and B); a brochure regarding the Weather Gard product line of construction fasteners from Construction Fasteners, Inc. (Dx 50); a brochure which includes a discussion of the Weathergard Service Door from Cornell Iron Works (Dx 51); a brochure regarding Weatherguard Shoe Protectant from CSL, Inc. (Dx 52) and a bottle of the product purchased from a Sam the Shoe Doctor location in the Chicago loop (Dx 53); a brochure describing the Weather Guard II banner from Display Sales (Dx 65) and the banner (Dx 66) which does not contain any name; a product description of Weatherguard Primer (Dx 54) and paint can (Dx 55) from Farwest Paint Manufacturing Co.; and a brochure describing Weatherguard pallet covers, blankets and cart covers from Refrigiwear, Inc. (Dx 56) and a blanket without inscription (Dx 57). There were numerous other similar exhibits introduced demonstrating a wide variety of third party uses of the Weatherguard name. (Dx 58–64, 82 and 84). The Court is not surprised that other third party uses exist because the words "weather", defined in Webster's Ninth New College Dictionary as "state of the atmosphere with respect to heat or cold, wetness or dryness, calm or storm, clearness or cloudiness," and "guard" defined as "one assigned to protect or oversee another" are in common use in everyday language. It is therefore not surprising that businesses, in addition to the two parties engaged in this litigation, have chosen to combine these two common words for business purposes.

## VII. BURDEN OF PROOF ON LIKELIHOOD OF CONFUSION.

38. The Lanham Act provides national protection of trademarks in order to secure to the owner of the marks the goodwill of its

business and to protect the ability of customers to distinguish among competing producers. *Park 'N Fly, Inc., v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985). National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation. *Id.*

39. In order to prevail under its federal trademark infringement claim (count I), its federal unfair competition claim (count II), its state common law unfair competition claim (count III) and its state deceptive trade practices claim (count V), Knaack must prove two items by a preponderance of the evidence: (a) it owns prior rights in its WEATHER GUARD mark and (b) Rally's use of WeatherGUARD to identify car, van, pickup or sports utility vehicle covers creates a likelihood of customer confusion, deception or mistake. *Dunn v. Gull,* 990 F.2d 348, 351 (7th Cir.1993). In this case, it is undisputed that Knaack adopted its WEATHER GUARD mark prior to Rally's first use of its WeatherGUARD mark and that Knaack holds valid federal registrations for its WEATHER GUARD mark. Accordingly, the principal issue is whether consumers are likely to be confused about the identity or source of the products in the marketplace. *Reed–Union Corporation v. Turtle Wax, Inc.,* 77 F.3d 909, 911–2 (7th Cir.1996).

■ 40. The Court's ultimate conclusion on the likelihood of confusion is a question of fact. *AHP Subsidiary Holding Company v. Stuart Hale Company,* 1 F.3d 611, 616 (7th Cir.1993). The plaintiff must prove a "likelihood" of confusion, not a mere "possibility" of confusion. *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 619 (7th Cir.1995). Because a trademark is an identifier rather than a property "right," the use of a competitor's mark that does not cause confusion as to source is permissible. *Libman Co. v. Vining Industries, Inc.,* 69 F.3d 1360, 1362 (7th cir.1995). The likelihood of confusion must be determined with reference to the realities of consumer behavior in the relevant market. *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 381 (7th Cir.1996). Knaack must

prove that such likelihood of confusion would occur to a significant number of consumers and not merely in an isolated situation. *Door Systems, Inc. v. Pro–Line Door Systems, Inc.,* 83 F.3d 169, 173 (7th Cir.1996)(affirming summary judgment for defendant finding "we think it is wholly unlikely that any significant number of consumers would be misled. And that is the test."); *Libman Co. v. Vining Industries, Inc.,* 69 F.3d 1360, 1364 (7th Cir.1995) (holding no trademark infringement where no evidence that a "significant fraction" of the relevant market could have been misled). *Reed–Union Corp. v. Turtle Wax, Inc.,* 77 F.3d 909, 912 (7th Cir.1996) ("the trademark laws do not forbid minuscule effects on confusion, even if they can be measured reliably."). Because the party complaining about infringement bears this factual burden, skepticism or disbelief by the trier of fact is fatal. *Reed–Union Corp. v. Turtle Wax, Inc.,* 77 F.3d 909, 912 (7th Cir.1996).

■ 41. In evaluating the likelihood of consumer confusion for this claim of trademark infringement, the factors to be considered include:

(1) the degree of similarity between the marks in appearance and suggestion;

(2) the similarity of the products for which the name is used;

(3) the area and manner of concurrent use;

(4) the degree of care likely to be exercised by consumers;

(5) the strength of the complainant's mark;

(6) actual confusion; and

(7) an intent on the part of the alleged infringer to palm off its products as those of another.

*Forum Corporation of North America v. Forum, Ltd.,* 903 F.2d 434, 439 (7th Cir.1990). The proper weight given to each of these factors will vary from case to case. *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 381 (7th Cir.1996). This list is not exclusive, nor does any one factor end the inquiry. *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225, 1228 (7th Cir.1993).

## VIII. APPLICATION OF THE LIKELIHOOD OF CONFUSION FACTORS TO THE EVIDENCE PRESENTED.

### A. The Marks Are Similar.

42. A new name is confusingly similar to an existing trademark if it is similar in sound, appearance, meaning or connotation. *Independent Nail & Packing Co. v. Stronghold Screw Products Inc.*, 205 F.2d 921, 924 (7th Cir.1953). Rally's WeatherGUARD mark is identical to Knaack's WEATHER GUARD mark phonetically and in spelling. The connotation of the marks, protection from the elements, is likewise similar.

43. Although the marks are similar, they are not identical when viewed by consumers. Each party renders the mark differently. Rally's mark is one word with "weather" in lower case and "guard" in upper case. Knaack renders its mark as two words with only the initial letter in each word capitalized. Each party renders its mark with different type face, graphics and coloring. Knaack typically renders the mark in the color red. (Px 54). Rally renders the mark on a four-color box which is designed to be displayed with other Rally car covers as a family of products, all of which contain the Rally name and checkerboard flag. Knaack does not display its product in boxes.

44. The marks must be compared in light of what occurs in the marketplace, not sitting side by side on a podium in the courtroom. *James Burrough Ltd. v. Sign of The Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976).

### B. The Products Are Not Similar.

45. In analyzing the similarity of products, the question is "whether the products are the kind the public attributes to a single source." *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1169 (7th Cir.1986). Knaack and Rally are not competitors. They do not attend the same conventions and they did not know of each other's existence until the Rally trademark was flagged by its counsel in the *Official Gazette* publication. (Px 146 and 147).

46. There are three levels of product similarity delineated by the case law. In descending order of similarity, the levels are: (1) competitive; (2) non-competitive but related; and (3) non-competitive and non-related. *Munters Corp. v. Matsui Am., Inc.*, 730 F.Supp. 790, 798 (N.D.Ill.1989), Aff'd, 909 F.2d 250 (7th Cir.1990). Knaack's WEATHER GUARD products are non-competitive with Rally's car covers (i.e., a consumer would not purchase a Knaack WEATHER GUARD tool box or other WEATHER GUARD product as a substitute for a Rally vehicle cover) and are functionally unrelated (i.e., consumer would not use a Rally WeatherGUARD vehicle cover in connection with a Knaack WEATHER GUARD product). Plaintiff has failed to prove that a vehicle cover is the type of product which Knaack customers would expect to associate with Knaack. Knaack has never sold car covers, nor did it express any intent to expand into that market. Substantially all of Knaack's products are made of steel or aluminum. Car covers are soft goods. Knaack has simply failed to prove that there is any reasonable basis for consumers to presume an affiliation between Knaack and Rally's WeatherGUARD car cover. Both companies carry entirely different lines of products. This dissimilarity of products on a company-wide basis makes it even less likely that customers would believe that the two product types come from the same source. *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 548 (7th Cir.1982) ("If firms do not compete directly, it is harder to show that consumers are likely to be confused by similar terms.").

47. The Court rejects Knaack's argument that calling the Knaack line and Rally line of products motor vehicle accessories is sufficient to show a similarity of products. Knaack has failed to produce any evidence that purchasers of these product types perceive a commonality. *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627, 635 (7th Cir.1968) ("[w]hile the products of the automotive industry are necessary to provide mobility for the products of the trailer industry ... we cannot say that campers and trailers and sports cars are similar goods, similarly marketed.").

## C. The Area And Manner Of Use Is Different.

48. The third factor requires the Court to consider "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *Forum Corp. of North America v. Forum, Ltd,* 903 F.2d 434, 442 (7th Cir.1990). Plaintiff has failed to meet its burden to prove such a relationship.

49. Knaack has failed to prove a relationship in use. There was no evidence presented regarding whether any Knaack customers purchase car covers. Knaack has failed to show a single example of a car cover used in connection with any of its products. The channels of trade are divergent. Knaack sells its products primarily through specialty commercial distributors, and uses the mark to identify an entire product line. Rally distributes its vehicle covers to the masses through discounters and auto supply chains and uses the mark to identify a single product (vehicle cover) among a family of vehicle cover products at different price points. Rally does approximately 95% of its business directly to mass retailers and 5% through distributors and jobbers. Knaack does no business through mass retailers.

50. The evidence was clear that these companies, based on market realities, are not in the same industry. They exhibit at different trade shows, they use different channels of distribution and they have not come in contact with one another in the business world, except in court. While they have been quite competitive in court, this is not the relevant market, except for purposes of this decision.

51. Knaack has failed to prove that even one of its distributors carried any Rally car covers, let alone the WeatherGUARD line. Knaack's survey of approximately 125 selected distributors revealed that forty-four carried car covers, but none carried Rally car covers. (Dx 7). These distributors were selected for the survey by Knaack because they were the ones most likely to carry car covers. The clear inference from this proof is that there is no overlap in distribution, which also minimizes any possibility of confusion.

## D. The Consumers Are Likely To Exercise Care.

52. Plaintiff has failed to prove that consumers are not likely to exercise care in purchasing a $49 to $79 vehicle cover. *Nike, Inc. v. Just Did It Enterprises,* 6 F.3d 1225, 1230 (7th Cir.1993) ("[W]e cannot agree that as a matter of law consumers routinely purchase a $39.95 item without looking carefully at the product information."). Because car covers at mass merchandisers are sold at different price points and in competition with competing covers, consumers can be expected to inspect the product information before purchasing. Such inspection is presumed because car covers come in different sizes for different cars. Car covers are designed for different elements, such as rain and snow. Therefore, someone driving a Lincoln Town Car must make certain that they are buying the right size and quality of cover to meet their needs. There has been no evidence that a car cover is an impulse item which is purchased like an umbrella when it is raining outside. Therefore, because every Rally vehicle cover box has the Rally logo and flag clearly marked on the box, the Court finds no evidence from which it will draw the inference that consumers will be swept away to purchase the WeatherGUARD car cover without a careful examination of the box, its size, the features and the identity of Rally as the source. Plaintiff has failed to prove that the nature of the product, car covers, is likely to lead to a failure to exercise care in purchasing the product.

## E. Knaack Has Failed To Prove The Strength Of Its Mark In The Marketplace.

53. Knaack has failed to prove that it has a strong mark such that a purchaser of a Rally WeatherGUARD car cover is likely to be confused as to the source of the product. This is a fatal flaw in Knaack's case. Knaack has failed to bring forth a single witness, except for three of its own executives, to testify regarding the strength of its WEATHER GUARD name in the marketplace. Such testimony is insufficient because it contains little basis by which this Court

can determine the strength of the Weather-GUARD name in the market. The fact that Knaack has sold products under the WEATHER GUARD trademark for twenty-five years does not answer the question of whether the name resonates in the consumers' consciousness. The fact that Knaack has spent money on advertising does not answer the question of whether the advertising was successful in building a brand name. The fact that sales have increased does not explain whether sales grew because of the brand name or because consumers rely on their distributors, the product features or some other element unrelated to the name. By analogy, as the Court writes this decision, the Court is extremely pleased with the quality of the chair on which I am seated. It has nice arms, good back support and is made of fine leather. The Court has no idea who the manufacturer is. The fact that Knaack produces a quality product does not automatically create name recognition in its customers. It is the strength of its name which is the necessary predicate to establish confusion.

54. The "strength" or "weakness" of Knaack's WEATHER GUARD mark is a critical factor in this case because Knaack claims an infringement based on Rally's sale of a non-competing and functionally unrelated product. "If the mark is weak, its protection may have an 'extremely narrow scope'; and may indeed be limited to similar goods similarly marketed. Only the strong mark will be protected against infringements arising out of its use in connection with non-competing goods." *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir.1978). A mark is strong "because of its fame or its uniqueness." *Id. see also Somat Corp. v. Somat Corp.*, 1992 WL 315198 (N.D.Ill. October 26, 1992) (following *Telemed*); *GB Electrical, Inc. v. Thomas & Betts Corp.*, 37 U.S.P.Q.2d 1177 (E.D.Wis.1995) (following *Telemed*).

55. Knaack's ownership of three federal incontestible registrations for its WEATHER GUARD mark creates no presumption of strength in its mark nor does it broaden the scope of the mark's protection. "Incontestability does not broaden a trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim." *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 377 (7th Cir.1976); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1058 (7th Cir.1995) ("[T]hat SWEETARTS is an incontestible mark for sugar candy does not make [plaintiff] the gatekeeper of these words for the whole food industry."). *See also Oreck Corp. v. US. Floor Systems, Inc.*, 803 F.2d 166, 171 (5th Cir.1986) ("[I]ncontestible status does not make a weak mark strong."). Knaack, therefore, bears the burden of proving the strength of its mark based on its actual strength in the marketplace.

56. Knaack's WEATHER GUARD mark is hardly unique. The mark is neither invented nor arbitrary. Instead, it represents the fusion of two common words: "weather" and "guard." *See Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219–220 (7th Cir.1978) (Telemed mark not entitled to protection against marks used in related but non-competing services because the mark "merely consisted of the fusion of two extremely common prefixes"). Used together as a mark, these words mean "to guard against exposure to the weather." In short, the mark connotes "weatherproof" or "weather-resistant." In the instant case, both the Knaack WEATHER GUARD products and the Rally WeatherGUARD car cover products are clearly intended to provide protection from the weather and both companies promote such a feature for their respective products. This common meaning of the words "weather guard" renders such mark weak and greatly limits its scope of protection. *M–F–G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir. 1987) (a plaintiff cannot exclusively appropriate "part of the language that it has neither created nor enriched" nor deny another party "a natural description for its products").

57. Another measure of a mark's strength or weakness is whether a significant number of third-parties use the same or a similar mark. *Telemed*, 588 F.2d at 219, 220 (numerous instances of third-party usage of "Tel-" and "Med-" prefix renders the "TEL-MED" mark weak). *See also Blazon*, 416 F.2d at 600 ("there are other companies in

other fields who use the word 'Blazon' in their title and their use of the word 'Blazon' no more than its use by the defendant here contributes to any confusion as to the source of the products"); *GB Electrical,* 1995 WL 795660 at 6 ("[t]he more contractors and electricians see the word 'Cyclone' on tools made by different companies, the less they will attribute a Cyclone mark to any one company"). A trademark owner's rights in its registered mark are limited and defined by other registrations issued by the United States Patent and Trademark Office. *FS Services, Inc. v. Custom Farm Services, Inc.,* 325 F.Supp. 153 (N.D.Ill.1970) (plaintiff's rights in its FS mark limited and defined by similar registered third-party marks). Further, a trademark owner's rights are further limited and defined by third-party common law use of substantially similar marks. *Id.* In the instant case, the extensive use of the marks incorporating Weather Guard by third-parties on a wide variety of goods, services, and businesses clearly demonstrate the lack of distinctiveness and strength in Knaack's mark.

58. The alleged strength of Knaack's mark is also undermined by its uneven trademark enforcement efforts against numerous third-party users. Knaack's explicit consent to use of the Weather Guard mark by third-parties, particularly in connection with automotive products (Weather Guard U.S.A.) and storage products (Hometech) restricts the scope of its own WEATHER GUARD mark and limits its ability to assert infringement of that mark against Rally. *See FS Services, Inc. v. Custom Farm Services, Inc.,* 325 F.Supp. 153 (N.D.Ill.1970).

59. Knaack's claim that its WEATHER GUARD mark has acquired strength through extensive promotion is unpersuasive. Substantially, all of Knaack's promotional activities for its WEATHER GUARD line—its catalog, its trade show exhibits, its mobile demonstration units, and its cooperative advertising—target a narrow, highly specialized market. Knaack's failure to produce any survey evidence or direct testimony from the relevant customer group undermines its ability to prove the strength of its mark in its own market. Promotion

alone is not dispositive of the mark's strength. *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir.1992) ("evidence of sales, advertising and use is entirely circumstantial, and … this type of evidence alone is often insufficient to establish secondary meaning").

60. Moreover, even if Knaack could establish WEATHER GUARD as a strong mark in its own market, there is utterly no evidence that such strength has spilled into the general consumer market. *See Telemed,* 588 F.2d at 220 n. 2 (Though the plaintiff expended $1 million on advertising "it nevertheless directed this advertising to a class of highly discriminating purchasers.... On the other hand, defendants gear their program not to the discriminating professional but rather to the public in general.... Clearly, the parties herein do not compete in the public marketplace for prospective customers."); *Somat,* 1992 WL 315198 (N.D.Ill. October 26, 1992) at 5. ("Though it is true that the plaintiff spends between $150,000.00 and $250,000.00 per year on advertising, that advertising is largely limited to trade shows and publications in the food service industry. No evidence was presented to show what effects, if any, this advertising has outside of that industry"). Obviously, the Knaack WEATHER GUARD mark lacks the widespread fame and celebrity as marks such as Coca–Cola, Polaroid, Disney, Kodak or Rolls Royce. *See Somat,* 1992 WL 315198 at p. 5 (contrasting the weakness of the SOMAT mark to such famous marks). Based on the foregoing, Knaack has failed to prove that its WEATHER GUARD mark is strong and entitled to protection outside its specific market.

**F. There Was No Evidence Of Actual Confusion.**

61. There was no evidence of actual confusion. Because of the limited time frame before trial, fourteen months, and the limited number of Rally units involved, less than 10,000, the lack of such evidence of actual confusion is not surprising and is given very little weight by the Court. Stephen J. Moore, Knaack's Marketing Vice President, candidly acknowledged that its products are

functionally different from Rally's, that Knaack has not lost any sales as a result of Rally's actions and that he has no knowledge of any economic loss to Knaack arising out of Rally's introduction of the WeatherGUARD car cover.

### G. Rally Did Not Intend To Palm Off Its Product As That Of Knaack's.

62. Knaack has failed to prove that Rally was attempting to trade on Knaack's goodwill or to mislead the public into believing that its vehicle covers were in some way affiliated with Knaack. In fact, the Court finds that Rally acted in good faith in its decision to adopt the WeatherGUARD mark for its fitted car covers and to now expand the line into covers for vans, pickups and recreational vehicles at the request of its largest customer.

63. Rally had no knowledge of Knaack's use of the WEATHER GUARD mark at the time it selected the WeatherGUARD mark. The Court finds the testimony of Marc Iacovelli credible regarding the decision to select the WeatherGUARD mark following a brain storming session with his creative director. Rally then directed trademark counsel to search and to opine on whether Rally could proceed with that name. Rally's reliance on counsel was reasonable, but as this litigation demonstrates, expensive.

64. Rally could reasonably find further comfort in the decision by the U.S. Patent and Trademark Office to approve Rally's trademark application for the Weather-GUARD mark. While such approval is not made on the basis of market realities, but rather, on the four corners of the trademark records contained in the U.S. Patent and Trademark Office files, such a determination could be deemed by Rally to further support its counsel's advice.

65. Given the dissimilarity between Rally's product and Knaack's product, Rally's decision to proceed with the introduction of its WeatherGUARD car covers after it learned of Knaack's opposition to such usage did not change a good faith adoption to a bad faith adoption. "The fact that one believes he has a right to adopt a mark already in use

because in his view no conflict exists since the products are separate and distinct cannot, by itself, stamp his conduct as in bad faith." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 962 (7th Cir.1992). Rally had every right to stand up and fight for what it believed was appropriate conduct on its part.

66. The Court finds that Rally acted in the utmost good faith in adopting the WeatherGUARD trademark for its car covers. As Jeffrey Samuels explained, there was no requirement for Rally to conduct a trademark search, to file before use or to wait for issuance of an approval from the trademark office before using the name. Yet, Rally acted carefully and with the advice of counsel through every step of the process. The mere fact that Knaack raised an opposition did not require Rally to cease use. The fact that others had backed down in the face of Knaack's litigation did not require Rally to do so. Rally has put Knaack to its proofs.

### H. Knaack Has Failed To Prove A Likelihood Of Confusion.

67. As explained in McCarthy on Trademarks and Unfair Competition § 23:63 (4th ed. 1996) "There are at least three evidentiary routes to prove a likelihood of confusion: 1. Survey evidence; 2. Evidence of actual confusion; and 3. Argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace." The Court has weighed all of the evidence and finds that Knaack has failed to prove a likelihood of confusion. No direct evidence. No survey evidence. No evidence as to the strength of brand name awareness. No reasonable inference can be made that confusion in the marketplace will "likely" occur. Possible confusion? Only a slight and far fetched possibility. But, that isn't enough. We can all sit around and speculate on whether a sheep can be cloned, but show me the beef. Similarly, we can concoct a scenario by which a Rally customer can enter a Venture store and be so taken by the WeatherGUARD name on the Rally box that he buys the car cover because of his great love and affection for his Knaack WEATHERGUARD box.

Unlike the cloned sheep, Rally has failed to produce the "beef." There has been a failure of proof and therefore Knaack cannot prevail. Knaack has simply failed to carry its burden of proof.

68. Even if Knaack could prove a "likelihood" of confusion with competent evidence, Knaack cannot demonstrate that such confusion would effect a "substantial" or "significant" number of consumers in the marketplace. Knaack has presented no competent evidence establishing (a) what portion of its WEATHER GUARD customers purchase car covers annually, (b) what portion of such sub-group would purchase Rally's Weather-GUARD car covers (versus car covers sold by third-parties), and (c) what portion of such sub-sub-group would purchase the Rally WeatherGUARD car cover due to a misperception of Knaack's affiliation or sponsorship (versus a myriad of reasons unrelated to Knaack). The Court can only speculate as to the answer and this, by itself, defeats Knaack's claim under clear Seventh Circuit precedent. As the Seventh Circuit has recently stated: "[A] finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof." *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1363 (7th Cir.1995).

## IX. KNAACK'S ANTI–DILUTION CLAIMS.

69. Knaack has not demonstrated liability against Rally under the recently enacted Federal Trademark Dilution Act of 1995 (count III) or the Illinois Anti–Dilution Act (count IV). Under both statutes, the Court must evaluate the distinctiveness of the plaintiff's mark and whether the mark is being diluted. *See Intermatic, Inc. v. Toeppen*, 947 F.Supp. 1227 (N.D.Ill.1996). The federal act only applies to "famous" marks, 15 U.S.C. § 1125(c), while the Illinois Act similarly requires proof of a very strong mark. *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1174 (7th Cir. 1986); *Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153 (7th Cir.1984) (Hyatt Hotel held highly distinctive). *See Restatement (Third) of Unfair Competition*, § 25, comment (e) at 268 ("As a general matter, a trademark is sufficiently distinctive to be diluted by a non-confusing use if the mark retains its source significance when encountered outside the context of the goods or services with which the mark is used by the trademark owner").

70. In the instant case, Knaack cannot satisfy the famous-distinctiveness prong of the analysis. As previously discussed, Knaack has failed to prove that its WEATHER GUARD mark is strong and such failure of proof applies with equal force to the dilution analysis. *See* 15 U.S.C. § 1125(c)(1) (outlining an 8–factor test comparable to the Seventh Circuit's 7–factor test); *Source Services Corp. v. Chicagoland JobSource, Inc.*, 643 F.Supp. 1523, 1534 (N.D.Ill.1986) (applying the trademark "strength" analysis to the dilution claim).

71. Even if Knaack established its mark as famous and strong, it has failed to prove that Rally's use of the Weather-GUARD mark to identify car covers would likely "dilute" the distinctiveness of its own mark. In the instant case, Rally's promotion of its WeatherGUARD car covers is limited primarily to the product's packaging. Accordingly, dilution would occur, if at all, when a Knaack customer (or someone already familiar with the Knaack mark) happens to need a car cover, happens to go to a store carrying car covers, and happens to see the WeatherGUARD packaging. As discussed above in the trademark analysis, Knaack has not provided the Court with any competent evidence from which the Court can reasonably infer dilution.

72. Moreover, given the sophistication of the Knaack WEATHER GUARD customer, it defies plausibility to assume that such customer's exposure to the Rally Weather-GUARD packaging would cause any meaningful dilution of the Knaack WEATHER GUARD mark. *See Mead Data Central, Inc. v. Toyota Motor Sales USA, Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989) (no dilution to LEXIS computer services caused by LEXUS automobile because the "strength and distinctiveness of LEXIS is limited to the market for its services—attorneys and accoun-

tants" while outside such market "LEXIS has very little selling power"). Accordingly, Knaack cannot obtain relief against Rally under its dilution claims.

### X. KNAACK'S STATE LAW CLAIMS.

73. Not having shown any likelihood of confusion, Knaack cannot recover for deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act (count V) or its state common law unfair competition claim (count VI). *See McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1174 (7th Cir.1986) ("likelihood of confusion has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in traditional infringement cases"); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir.1993) ("The state unfair competition claim is analyzed under the likelihood of confusion standard and thus mirrors our infringement analysis"); *Ziebart International Corp. v. After Market Associates*, 802 F.2d 220, 228 (7th Cir.1986) (same).

### XI. CONCLUSION.

74. Pursuant to the foregoing findings of fact and conclusions of law, **the Court enters judgment in favor of defendant, Rally Accessories, Inc. and against Knaack Manufacturing Company, on all counts of plaintiff's complaint and awards the costs of suit to defendant.**